IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| HOPE ZISUMBO, an individual,<br><br>    Plaintiff,<br><br>v.<br><br>CONVERGYS CORP., a corporation; RYAN MITCHELL, an individual; and ADRIANA WOLDBERG, an individual;<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:14-cv-00134<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

This case arises from an employment dispute between Plaintiff Hope Zisumbo and Defendants Convergys Corp., Ryan Mitchell, and Adriana Woldberg (collectively, Convergys). Zisumbo asserts causes of action against defendants for: (1) interference with her rights under the Family and Medical Leave Act (FMLA), (2) violations of the Employee Retirement Income Security Act (ERISA), and (3) common law negligence.[1]  Before the court are the parties' cross-motions for summary judgment and Zisumbo's Motion for Spoliation Sanctions.  For the reasons explained below: Zisumbo's Motion for Summary Judgment is DENIED, Zisumbo's Motion for Spoliation Sanctions is DENIED, and Convergys's Motion for Summary Judgment GRANTED IN PART and DENIED IN PART.

---

[1] *See* dkt. 91.

# BACKGROUND[2]

## Zisumbo's Employment History with Convergys

Zisumbo began working for Convergys in May 2012, where she was assigned to work full-time on the United States Postal Service (USPS) Project.[3]

On April 28, 2013, Zisumbo chose to convert to a part-time position on the USPS Project because she planned to attend college.[4]  From May 1, 2013 through June 2, 2013, Zisumbo took a health-related leave of absence from Convergys.[5]  Zisumbo was hospitalized for a portion of May 2013.[6]

Zisumbo returned to her part-time position on the USPS Project on June 3, 2013, and continued to work part-time on the USPS Project through June 21, 2013.[7]  Because the USPS Project was scheduled to wind down at the end of June 2013, Zisumbo elected to transfer to Convergys's DirecTV Project beginning June 24, 2013.[8]

Zisumbo was unable to begin training on the DirecTV Project on June 24, however, because she was hospitalized and received treatment for a kidney stone.[9]  On June 25, 2013, Zisumbo sent her supervisor, John Patton, a text saying she was in the hospital's Intensive Care

---

[2] The facts provided in this section are undisputed unless otherwise noted.

[3] Dkt. 110 at 12, ¶ 1.

[4] Dkt. 110 at 12, ¶ 5.

[5] Dkt. 110 at 15–16, ¶¶ 21–22.

[6] Dkt. 110 at 16, ¶ 22.

[7] Dkt. 110 at 16, ¶ 23.

[8] Dkt. 110 at 16, ¶ 24.

[9] Dkt. 112 at 4, ¶ 8.

Unit and that she "had surgery for [a] life threatening kidney stone."[10]  Patton responded that he

was "praying" for her and that either she or her mother should apply for FMLA leave.[11]

On June 27, 2013, Zisumbo was terminated.[12]  In his deposition, Patton testified that he

terminated Zisumbo at her request.[13]  Zisumbo denies that she made any such request.[14]  On the

Termination Record, Patton indicated that Zisumbo's separation was voluntary.[15]  The

Termination Record was signed by one of Convergys's Operations Managers, Defendant Ryan

Mitchell, and processed by Convergys's Ogden-based Employee Relations Manager, Defendant

Adriana Woldberg.[16]

On June 28, 2013, Patton texted Zisumbo:

Good morning, I don't know if Jamie or Ryan called or text you yesterday. But we
term you for medical reasons. You will be able to come back when [you're] ready
@ same pay. Make sure you keep doctor and hospital paperwork you will need to
show that. Feel better soon! Praying for you. JP2

You need [to] be back within 30 days. JP2[17]

Zisumbo did not return to work at Convergys.[18]  Zisumbo alleges to have incurred over $100,000

in medical expenses from May through July of 2013.[19]

---

[10] Dkt. 112 at 4, ¶ 9.

[11] Dkt. 110 at 8, ¶ 27.

[12] *See* dkt. 110 at 17, ¶ 28.

[13] Dkt. 110-3 at 234.

[14] *See* dkt. 124 at 13.

[15] Dkt. 110 at 17, ¶ 28.  Zisumbo does not dispute that Patton indicated on the Termination Record that her
separation was voluntary.  Dkt. 124 at 13.  Zisumbo does, however, dispute whether her separation actually was
voluntary.  Dkt. 124 at 13.

[16] Dkt. 110 at 17, ¶¶ 30–31.

[17] Dkt. 110 at 18, ¶ 32.

[18] *See* dkt. 112 at 5, ¶ 18.  It is undisputed that Zisumbo did not return to work at Convergys.  It is, however,
disputed whether Zisumbo attempted to return to work at Convergys.  *See* dkt. 112 at 5, ¶ 18; dkt. 125 at 13.

[19] Dkt. 110 at 18, ¶ 36.

<u>Zisumbo's Health Insurance History with Convergys</u>

*SelectHealth Plan*

When Zisumbo joined Convergys as a full-time employee in May 2012, she signed up for health insurance through SelectHealth.[20]  Zisumbo began receiving those benefits in the summer of 2012.[21]  One eligibility requirement for the SelectHealth Plan was that the employee be scheduled to work at least 37.5 hours per week.[22]

As discussed above, Zisumbo converted to part-time status on April 28, 2013.[23]  As a result, The Boon Group—a third-party benefits administrator for Convergys—notified SelectHealth that Zisumbo had converted from full-time employment to part-time employment.[24]

In a letter dated July 17, 2013, SelectHealth informed Zisumbo that her benefits under the SelectHealth Plan had ended on April 30, 2013.[25]  Convergys did not provide Zisumbo with a notice during the 2013 calendar year explaining her rights to continued coverage under the SelectHealth Plan under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).[26]

On July 11, 2014, Convergys sent Zisumbo a letter that stated in relevant part:
We recently learned that you were not sent notice of your COBRA rights at the time of your Qualifying Event(s).

---

[20] Dkt. 112 at 3, ¶ 3.

[21] Dkt. 112 at 3, ¶ 3.

[22] Dkt. 110 at 12, ¶ 4.  Zisumbo disputes that Convergys has provided documentation proving this to be the case. The court disagrees.  *See* dkt. 110-3, Ex. E-1 (copy of written online reference tool for Convergys employees showing 37.5 hour requirement for SelectHealth Plan).

[23] Dkt. 112 at 3, ¶ 4.

[24] Dkt. 110 at 13, ¶ 7.  Zisumbo disputes that this fact is material.

[25] Dkt. 110 at 19, ¶ 38.

[26] Dkt. 110 at 19, ¶ 39.

4

Enclosed you will find the COBRA notification package (the "COBRA Notice") that you would ordinarily have received at the time of your Qualifying Event(s).

If you elect COBRA coverage, you will be required to pay the premium for the COBRA coverage you elect, retroactive to the start of the coverage. If elected, your COBRA coverage must begin as of the first day of the month after your employment termination date. The maximum period of coverage is 18 months, unless an extension of the COBRA coverage period applies to you.

If you had been able to elect COBRA coverage when you first terminated employment, you would have been required to pay the premium for the COBRA coverage you elected, retroactive to the start of the coverage. Because there has been a delay in providing your COBRA notification, if you now elect retroactive COBRA coverage you will be responsible to pay the same amount of monthly premiums, but you will not be required to pay the retroactive premiums immediately. Instead, you will be allowed to pay the premiums for the months of coverage you elect, on a monthly schedule beginning after you elect the coverage and continuing for the number of months of coverage you elected.

The applicable monthly premium for the Select Health Government Employee option is $485.21 a month.

The applicable monthly premium for the AETNA Part Time Government Employee option is $466.75 a month.[27]

Zisumbo did not elect COBRA coverage under the SelectHealth Plan.[28]

*AETNA Plan*

On June 20, 2013, The Boon Group sent Zisumbo a letter (the Aetna Letter) that stated,

in relevant part:

Welcome to the Aetna Voluntary Plans® insurance plan.

Enclosed in your packet are the following:

• Identification card(s)
• HIPPA Authorization Form
• HIPPA Privacy Notice
• Prescription Mail Order Form

---

[27] Dkt. 110 at Ex. H.

[28] Dkt. 110 at 20, ¶ 41.

Your employer has enrolled you in the Benefits Plus Plan underwritten by Aetna Life Insurance Company.

If you have not yet completed an enrollment form, please see your employer immediately to avoid any delay and/or denial of claims. Your enrollment form specifies eligible dependents you wish to enroll as well as your designated beneficiary for Life benefits.

For questions regarding your premiums or claims, please contact Member Services, toll free, at 1-800-292-3374. Representatives will be available to assist you Monday through Friday from 6 a.m. to 7 p.m. and Saturday and Sunday from 9 a.m. to 11 p.m. Central Time.

DocFind (PPO plan) - To locate participating health care providers, visit, http://www.aetna.com/docfind/custom/aahc/bn or contact the Member Services department.

*Plans underwritten by Aetna Life Insurance Company*[.][29]

Zisumbo kept a copy of the Aetna Letter but denies that any identification card was enclosed.[30]

Zisumbo received a second letter from The Boon Group dated July 8, 2013, that is titled

"GENERAL NOTICE CONTINUATION COVERAGE RIGHTS."[31]  That letter stated, in

relevant part:

You are receiving this notice because you have recently become covered under a group health plan (the Plan). This notice contains important information about your right to continuation coverage, which is a temporary extension of coverage under the Plan. This notice generally explains continuation coverage, when it may become available to you and your family, and what you need to do to protect the right to receive it.

Continuation coverage can become available to you when you would otherwise lose your group health coverage, it can also become available to other members of your family who are covered under the Plan when they would otherwise lose their group health coverage. For additional information about your rights and obligations under the Plan you should review the Plan's Summary Plan Description or contact the Plan Administrator.[32]

---

[29] Dkt. 110 at Ex. P.

[30] Dkt. 110 at 14, ¶ 15.

[31] Dkt. 110 at Ex. U.

[32] Dkt. 110 at Ex. U.

The letter identifies "CONVERGYS (Govt)" as the plan administrator.[33]

In the course of this litigation, Zisumbo sent Convergys a number of discovery requests relating to the benefits she enjoyed while employed at Convergys. On January 26, 2015, Zisumbo served a discovery request for "all documents demonstrating or referring to [Zisumbo's] . . . benefits."[34] In that same request, Zisumbo asked "when, why, how, and by whom Ms. Zisumbo's health insurance benefits were canceled by Convergys."[35] Convergys responded that all documents had been produced and that Zisumbo's health insurance under the SelectHealth Plan was canceled when she ceased full-time employment.[36]

On September 26, 2018, Convergys amended its response to Zisumbo's discovery requests, stating for the first time that Zisumbo had been eligible for and enrolled in health insurance coverage from Convergys under a part-time benefit plan provided by Aetna and administered by The Boon Group (the Aetna Plan) for the months of May and June 2013.[37] On September 28, 2018, Convergys provided testimony in a Rule 30(b)(6) deposition, in which its representative testified that part-time employees in the USPS project were eligible to be enrolled in the Aetna Plan and that Convergys had not realized until the prior week that Zisumbo had been eligible for—and enrolled in—the Aetna Plan.[38] Convergys produced plan documents associated with the Aetna Plan for the first time on July 26, 2019.[39]

---

[33] Dkt. 110 at Ex. U.

[34] Dkt. 112 at 6, ¶ 22.

[35] Dkt. 112 at 6, ¶ 23.

[36] Dkt. 112 at 6–7, ¶¶ 22–23.

[37] Dkt. 112 at 7, ¶ 24; dkt. 110 at 13, ¶ 10.

[38] Dkt. 112 at 7, ¶ 25.

[39] Dkt. 112 at 8, ¶ 26.

Zisumbo alleges she was never informed that she was eligible for any benefits under the Aetna Plan, let alone enrolled in that plan.[40]

Procedural History

Zisumbo filed her initial Complaint on June 4, 2014, in Utah state court.[41]  Convergys removed the action to federal court on October 22, 2014.[42]  On June 26, 2015, Zisumbo filed her First Amended Complaint.[43]  On September 4, 2015, Convergys moved for summary judgment on the First Amended Complaint.[44]  On November 22, 2017, the court granted Convergys's motion in part.[45]

On January 25, 2019—four months after Convergys first disclosed that Zisumbo was enrolled in the Aetna Plan—Zisumbo moved for leave to amend the First Amended Complaint to include new claims related to the Aetna Plan.[46]  On March 13, 2019, the court granted Zisumbo's motion.[47]

On March 14, 2019, Zisumbo filed her Second Amended Complaint.[48]  The Second Amended Complaint contains causes of action for: (1) interference with Zisumbo's rights under

---

[40] Dkt. 112 at 8, ¶ 27.  Convergys disputes that Zisumbo was never informed of her eligibility for and enrollment under the Aetna Plan.

[41] *See* dkt. 2.

[42] Dkt. 2.

[43] Dkt. 22.

[44] Dkt. 30.

[45] Dkt. 47.

[46] Dkt. 75.

[47] Dkt. 90.

[48] Dkt. 91.

the FMLA; (2) violations of ERISA; and (3) common-law negligence.[49]  In December 2019, Convergys and Zisumbo filed their cross-motions for summary judgment.[50]

In addition to the parties' cross-motions for summary judgment, the parties also filed motions for spoliation sanctions.[51]  Convergys filed its Motion for Spoliation Sanctions on December 6, 2019.[52]  On January 8, 2020, the court granted Convergys's motion, noting that Zisumbo failed to timely respond to Convergys's motion and therefore the motion was unopposed.[53]  In doing so, however, the court reserved its decision on any sanctions for a later date.[54]  On January 16, 2020, Zisumbo filed her own Motion for Spoliation Sanctions in which she requests sanctions against Convergys.[55]  The court has not yet ruled on Zisumbo's Motion.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."[56]  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[57]  Under this standard, the court will "view the evidence and draw reasonable inferences therefrom in the

---

[49] *See* dkt. 91.

[50] Dkt. 110 (Convergys); dkt. 112 (Zisumbo).

[51] Dkt. 109; dkt. 122.

[52] Dkt. 109.

[53] Dkt. 120.

[54] Dkt. 120 at 3.

[55] Dkt. 122.

[56] Fed. R. Civ. P. 56(a).

[57] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

light most favorable to the nonmoving party."[58]  "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."[59]

## ANALYSIS

The court begins its analysis by addressing the parties' motions for spoliation sanctions, concluding spoliation sanctions are not warranted in this instance.[60]  The court next addresses the parties' cross-motions on Zisumbo's FMLA interference claim.  The court finds a genuine dispute of material fact exists concerning whether Convergys interfered with Zisumbo's exercise of her rights under the FMLA.  The court also addresses issues related to the damages Zisumbo may seek on her FMLA claim.  The court then turns to Zisumbo's ERISA claim and concludes that it is time-barred.  Finally, the court reaches Zisumbo's negligence claim, concluding that it is preempted by ERISA.

### I. SPOLIATION

As explained above, both parties have filed motions seeking spoliation sanctions.  The court has granted Convergys's motion—but reserved the issue of sanctions for a later date—and has not yet ruled on Zisumbo's motion.

Both parties' motions revolve around the same set of facts.  The parties agree that on June 25, 2013, Zisumbo texted Patton to tell him she was in the hospital.  The parties further agree that on June 28, 2013, Patton texted Zisumbo and told her, "we term you for medical reasons."  But the parties disagree about what happened between June 25 and June 28. Convergys, citing Patton's sworn deposition testimony, claims that Zisumbo contacted Patton via

---

[58] *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000).

[59] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[60] The sanctions requested by the parties would materially bear on the court's analysis of Zisumbo's FMLA claim. Thus, the court resolves the issue of sanctions before addressing the parties' cross-motions for summary judgment.

call or text to inform him that she was resigning from her employment at Convergys.[61]  Zisumbo denies that she ever resigned by call or text.[62]

The parties have been unable to produce concrete evidence of what transpired between June 25 and June 28.  Neither party has been able to produce a cell phone containing the full text message conversation between Zisumbo and Patton.[63]  And Patton's phone records obtained during discovery are similarly inconclusive.  Patton's phone records show no calls between his phone number and Zisumbo's phone number on June 26 and June 27.[64]  Patton's phone records also show no outgoing text messages to Zisumbo on June 26 and June 27.[65]  But Patton's phone records show only outbound text messages.  As a result, Patton's phone records fail to establish whether Patton received any inbound text messages from Zisumbo on those days.

The thrust of both parties' motions is that the other should be sanctioned for failing to preserve the relevant phones.[66]  Both parties argue the other side's failure to preserve these phones has resulted in substantial prejudice to the moving party.  The court concludes that sanctions are not warranted here for either party.

"A spoliation sanction is proper where: '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party

---

[61] Dkt. 109 at 2.

[62] Dkt. 135 at 9.

[63] When Convergys served a discovery request asking Zisumbo to "[p]roduce for inspection [her] personal cellular phone that [she] used from June 2013 through July 2013," Zisumbo responded that she was unable to locate the phone she used in June and July 2013 and that she believed she had long since given it to her sister.  Dkt. 109-6.  In her Reply to Convergys's Opposition, Zisumbo now states she has found the relevant phone, but she no longer remembers the password and cannot access its contents.  Dkt. 135 at 12.

Patton's phone was recovered by Convergys in July 2015.  Dkt. 126 at 4.  Patton's phone was turned over to Xact Data Discovery for a forensic analysis, but Xact did not recover any relevant text messages.  Dkt. 126 at 4.

[64] Dkt. 124-9.

[65] Dkt. 124-9.

[66] Convergys's motion is premised upon Zisumbo's failure to preserve the phone she used in June 2013.  And Zisumbo's motion is premised upon Convergys's failure to preserve Patton's phone.

was prejudiced by the destruction of the evidence.'"[67]  Neither party has established that

evidence existed at one point in time that the other party was under a duty to preserve.

Specifically, neither party has established that there were, in fact, any text messages between

Zisumbo and Patton on June 26 and June 27.  Indeed, the parties have established only the

absence of outgoing text messages from Patton's phone to Zisumbo's phone.  And neither

Zisumbo nor Patton have testified with certainty that they exchanged text messages on June 26

and June 27.[68]  As a result, the court cannot conclude that either party was prejudiced by the

other's failure to preserve the relevant phones.  Thus, the court DENIES Zisumbo's Motion for

Spoliation Sanctions[69] and also declines to sanction Zisumbo in connection with Convergys's

earlier motion.

## II. ZISUMBO'S FMLA CLAIM

Zisumbo moves for summary judgment on her FMLA interference claim in its entirety.

Convergys responds that a genuine dispute of material fact exists that precludes the court from

entering summary judgment in Zisumbo's favor.  For the reasons explained below, the court

agrees with Convergys and therefore DENIES Zisumbo's Motion on this issue.

In its own Motion, Convergys argues it is entitled to summary judgment limiting the

relief available on Zisumbo's FMLA claim.  For the reasons explained below, the court

GRANTS IN PART and DENIES IN PART Convergys's Motion on this issue.

---

[67] *Jones v. Norton*, 809 F.3d 564, 580 (10th Cir. 2015) (citation omitted).

[68] To be sure, Zisumbo testified, "I believe I texted him," in response to a question asking whether she knew if she had texted Patton between June 25 and June 28.  Dkt. 126-6 at 4.  But neither Zisumbo nor Patton testified with certainty that they exchanged texts.  In fact, Patton testified that he does not recall whether Zisumbo's alleged resignation was communicated over phone or text and that he "believe[s] it was a call."  Dkt. 110-3 at 234.

[69] Dkt. 122.

A. Zisumbo's Motion

An FMLA interference claim has three elements: (1) the employee was entitled to FMLA leave, (2) some adverse action by the employer interfered with the employee's right to take FMLA leave, and (3) the employer's action was related to the employee's exercise or attempted exercise of their FMLA rights.[70]   Once an employee proves the first two elements, the burden shifts to the employer to prove that the adverse action was unrelated to the employee's exercise or attempted exercise of FMLA rights.[71]

In her Motion, Zisumbo argues Convergys interfered with her right to FMLA leave when it terminated her and that her termination was related to her June 2013 hospitalization.[72]   Thus, Zisumbo argues she is entitled to summary judgment on this claim.  Convergys responds that a genuine dispute of material fact exists concerning whether Zisumbo's termination was related to her exercise or attempted exercise of FMLA rights.  The court agrees with Convergys.

In her Motion, Zisumbo points to Patton's text message that states, "we term you for medical reasons," as evidence that her termination was related to her exercise or attempted exercise of FMLA rights.[73]   But Zisumbo ignores important evidence to the contrary.  Most notably, Zisumbo ignores Patton's sworn testimony that Zisumbo contacted him by call or text to inform him that she was resigning from her employment.[74]   Additionally, the Termination Record that Patton prepared for Zisumbo identifies her termination as "voluntary."[75]   With this evidence in hand, a reasonable juror could conclude that Zisumbo voluntarily resigned her

---

[70] *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007).

[71] *Id.*

[72] Dkt. 112 at 10.

[73] Dkt. 112 at 10.

[74] Dkt. 125 at Ex. D.

[75] Dkt. 125 at Ex. F.

employment with Convergys on June 26 or June 27, 2013.  Indeed, if Zisumbo did communicate a desire to resign from her employment, Convergys would likely be able to prove that its termination of Zisumbo was unrelated to her exercise or attempted exercise of FMLA rights.

Seeking to avoid this conclusion, Zisumbo directs the court to Patton's phone records.[76] Those records show two things.  First, they show no phone calls between Patton and Zisumbo on June 26 and June 27.[77]  Second, they show no outbound text messages from Patton to Zisumbo on June 26 and 27.[78]  As noted above, however, the records do not show whether Patton *received* any text messages from Zisumbo on June 26 and June 27.  As a result, Patton's phone records do not conclusively dispute his sworn testimony that Zisumbo communicated her desire to resign from her employment.

Drawing all reasonable inferences in Convergys's favor, as the court must when evaluating Zisumbo's Motion, the court concludes Patton's sworn testimony—even when considered alongside his phone records—creates a genuine dispute of material fact concerning Convergys's reason for terminating Zisumbo.  Thus, the court cannot grant summary judgment in Zisumbo's favor on her FMLA interference claim.

<u>B. Convergys's Motion</u>

Convergys's Motion presents a number of arguments concerning the scope of relief available to Zisumbo under her FMLA claim.  The court addresses each argument in turn.

*i. Recovery of Medical Bills*

Convergys argues it is entitled to summary judgment on Zisumbo's FMLA claim to the extent she seeks recovery of medical bills as damages because the FMLA does not allow for

---

[76] Dkt. 135 at 13.

[77] Dkt. 129-6.

[78] Dkt. 129-3.

recovery of medical bills.[79]  Zisumbo responds that medical bills are recoverable under the

FMLA as "actual monetary losses."[80]  The court concludes that certain medical bills are

recoverable under the FMLA.

> The FMLA provides in relevant part:
>
> Any employer who violates section 2615 of [the FMLA] shall be liable to any
> eligible employee affected for damages equal to the amount of:
>
> (I)     any wages, salary, employment benefits, or other compensation
>         denied or lost to such employee by reason of the violation; or
> (II)    in a case in which wages, salary, employment benefits, or other
>         compensation have not been denied or lost to the employee, any
>         actual monetary losses sustained by the employee as a direct result
>         of the violation, such as the cost of providing care, up to a sum
>         equal to 12 weeks (or 26 weeks, in a case involving leave under
>         section 2612(a)(3) of this title) of wages or salary for the
>         employee.[81]

Here, Zisumbo asserts a claim for lost wages and employment benefits.[82]  As a result, only

subsection (I) applies to her claim.[83]  The question then becomes whether subsection (I) permits

Zisumbo to recover damages in the form of unpaid medical bills.

Convergys argues it would be too broad an interpretation to read subsection (I) to allow

for the recovery of unpaid medical bills.[84]  The court disagrees.  Subsection (I) allows for

damages equal to the amount of "employment benefits."  The FMLA defines "employment

benefits"  as "all benefits provided or made available to employees by an employer, including

group life insurance, *health insurance*, disability insurance, sick leave, annual leave, educational

---

[79] Dkt. 110 at 27.

[80] Dkt. 124 at 23–24.

[81] 29 U.S.C. § 2617(a)(1).

[82] Dkt. 91, ¶ 47.

[83] *See* 29 U.S.C. § 2617(a)(1) (A)(i)(II) (noting subsection (II) applies only "in a case in which wages, salary,
employment benefits, or other compensation *have not been denied or lost to the employee*" (emphasis added)).

[84] Dkt. 110 at 27.

15

benefits, and pensions."[85]  Thus, subsection (I) allows recovery of damages equal to the amount

of "health insurance."  Courts have interpreted this to mean an employee can recover damages

for medical bills to the extent her bills would have been covered by her health insurance had she

not been terminated.[86]  Accordingly, subsection (I) allows Zisumbo to recover damages in the

form of medical bills that would have been covered by her health insurance with Convergys but

for her termination.

       Convergys nonetheless argues that "payment of [Zisumbo's] medical bills  . . . was never

an 'employment benefit' offered to Zisumbo."[87]  But Convergys's argument is nothing more than

an exercise in semantics.  It may well be literally true that "payment of medical bills" was never

an employment benefit Zisumbo enjoyed at Convergys.  Zisumbo did, however, enjoy the benefit

of health insurance.  And the practical effect of having health insurance is that it would pay

Zisumbo's medical bills, subject to the terms of the plan.  Thus, while subsection (I) may not

allow for damages in the amount of "payment of medical bills," it does allow for damages in the

amount of medical bills incurred that would have been covered by the employee's health

insurance but for the alleged wrongful termination.[88]

       This is not to say, however, that Zisumbo is necessarily entitled to damages in the amount

she seeks here.  Zisumbo can recover only medical bills that were incurred *as a result of her*

*termination*.  By way of example, Zisumbo is not entitled to recover damages for medical bills

---

[85] 29 U.S.C. § 2611(5) (emphasis added).

[86] *See Sherman v. AI/FOCS, Inc.*, 113 F. Supp. 2d 65, 76 (D. Mass. 2000) ("Plaintiff is also entitled to restoration of benefits that she would have received. Included therein are the damages she sustained because of the termination of her health insurance benefits, or $11,100, minus any deductibles, copayments or premiums that she would have been required to pay."); *Bowyer v. Dish Network, LLC*, No. 08-1496, 2010 WL 1610112, at *7 (W.D. Pa. 2010).

[87] Dkt. 110 at 28 n.9.

[88] To conclude otherwise would render subsection (I)'s inclusion of "health insurance" all but meaningless.  Indeed, it is difficult to conceive how an employee could recover damages in the amount equal to health insurance if that did not encompass medical bills that would have been paid for by that health insurance.

incurred as a result of her switch to part-time employment.  To the extent Zisumbo's switch to part-time employment changed her health insurance benefits and caused her to incur more medical bills than she would have incurred under her previous full-time health insurance plan, those additional costs are not recoverable under subsection (I).[89]

In sum, if Zisumbo can prove at trial that Convergys interfered with her exercise or attempted exercise of FMLA rights, then the FMLA permits recovery of damages in the form of medical bills.  That recovery, however, is limited to the amount of those bills incurred as a result of Convergys's FMLA interference.  In other words, Zisumbo may recover only those medical costs she incurred as a result of her termination.

*ii. Medical Bills Mitigation*

Convergys also argues that, even if the FMLA permits the recovery of medical costs, Zisumbo cannot collect them here because she failed to mitigate her medical cost damages.[90] Specifically, Convergys argues Zisumbo could have mitigated her damages by electing COBRA coverage under her SelectHealth plan when Convergys belatedly offered it to her in July 2014.[91] In Convergys's view, Zisumbo could have avoided over $100,000 in medical costs by paying around $1,500 in COBRA premium payments, and Zisumbo's failure to do so bars her from recovering damages for medical costs.[92]

---

[89] Zisumbo argues that her medical bills incurred in May and June 2013 were a result of her termination because "[b]y terminating her when it did, Convergys prevented her finding out about the AETNA coverage, leaving her saddled with the May and June 2013 hospital bills."  Dkt. 124 at 25.  But this argument stretches subsection (I) beyond its breaking point.  It was not her termination that prevented her from finding out about her coverage under AETNA.  Instead, it was Convergys's alleged failure to notify Zisumbo of her eligibility for and enrollment under that plan.  And relief for that claim is properly sought under ERISA, just as Zisumbo has done here.

[90] Dkt. 110 at 32.

[91] Dkt. 110 at 32.

[92] Dkt. 110 at 33.

The parties seem to disagree about whether Zisumbo had a duty to mitigate her medical costs damages in the first instance.[93]   But even assuming Convergys is correct that Zisumbo had a duty to mitigate, Convergys identifies no caselaw suggesting Zisumbo was required to mitigate in the manner it advocates here.

Convergys argues Zisumbo could have mitigated damages by electing COBRA coverage under the SelectHealth Plan.   But at the time of Zisumbo's termination, she was enrolled in the Aetna Plan.   Thus, if Zisumbo had not been terminated, she would have enjoyed health insurance coverage under the Aetna Plan.   To require Zisumbo to elect COBRA coverage under the SelectHealth Plan would be to require Zisumbo to pay additional money to elect COBRA coverage under the SelectHealth Plan when she would have had coverage under the Aetna Plan but for her termination.   Convergys identifies no authority suggesting an employee must mitigate her medical costs damages by pursuing insurance coverage beyond that which she enjoyed at the time of termination.

In support of its argument that an employee fails to mitigate damages when she does not elect COBRA coverage, Convergys cites to *Holford v. Exhibit Design Consultants*.[94]   But *Holford* is distinguishable.   *Holford* was an ERISA case in which the plaintiff employee alleged the defendant employer failed to provide proper notice of the plaintiff's right to continue coverage under COBRA.[95]   After the plaintiff filed suit, the defendant offered plaintiff the opportunity to elect COBRA coverage retroactive to the effective date of her separation.[96]   The

---

[93] *See* dkt. 110 at 33; dkt. 124 at 26.

[94] 218 F. Supp. 2d 901 (W.D. Mich. 2002).

[95] *Id.* at 904–05.

[96] *Id.* at 905.

plaintiff rejected defendant's offer, and the court held that plaintiff's rejection constituted failure to mitigate damages.[97]

The contemplated mitigation in *Holford* was different in kind than here.  In *Holford*, the offer to elect COBRA coverage would have placed plaintiff in the same position she would have been in but for defendant's deficient notice.  That is, if defendant had provided proper notice in the first instance, plaintiff would have been in a position to elect COBRA coverage—the same position in which plaintiff found herself when defendant later offered the chance to retroactively elect COBRA coverage.  Here, Convergys asks the court to hold that Zisumbo was required to elect COBRA coverage on a health insurance plan she was not even enrolled in at the time of her termination.  In doing so, Convergys effectively argues Zisumbo was required to pay additional money to obtain different health insurance after it terminated her.[98]  Convergys provides no authority for this proposition, and the court is unpersuaded by Convergys's reasoning.  Therefore, the court declines to enter summary judgment in Convergys's favor on this issue.

### iii. Lost Wages Mitigation

Convergys next argues that it is entitled to summary judgment on Zisumbo's claim for lost wages.  Convergys's argument is twofold.  First, Convergys argues Zisumbo should be barred from seeking lost-wage damages because she has failed to mitigate by reasonably seeking comparable employment since her termination.[99]  Second, Convergys argues that Zisumbo's

---

[97] *Id.* at 907.

[98] In its Reply, Convergys argues Zisumbo would not have had to pay "additional money" to elect COBRA coverage because if it had provided a proper COBRA notice in 2013, Zisumbo would have been required to pay COBRA premiums at that time to replace benefits under the SelectHealth Plan.  Dkt. 132 at 24–25.  But this argument misses the mark.  It is true that Zisumbo would have had to pay COBRA premiums in order to reinstate her benefits under the SelectHealth Plan.  But such an election would have been *in addition to* the benefits Zisumbo enjoyed under the Aetna Plan at the time of her termination.  And Convergys provides no authority for the proposition that an employee is required to mitigate by obtaining additional health insurance coverage.

[99] Dkt. 110 at 34.

failure to maintain any records of her post-Convergys earnings also bars her from recovering lost-wage damages.[100]   The court will address each argument in turn.

### a. Reasonable Efforts

An FMLA plaintiff seeking lost-wage damages is under a duty to mitigate those damages.[101]   The burden, however, is on the defendant to show a failure to mitigate.[102]   To prove a plaintiff has failed to mitigate her lost-wage damages, a defendant must establish: "(1) that the damage suffered by plaintiff could have been avoided, i.e., that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position."[103]   Courts have relieved employers from the burden of proving the availability of suitable positions when the employer demonstrates the employee has made no reasonable efforts to obtain suitable employment.[104]

Convergys argues there existed a substantial number of suitable job openings and Zisumbo's efforts to obtain comparable employment were "patently unreasonable and insufficient."[105]   Convergys primarily argues that Zisumbo "made little effort to find full-time work" and takes issue with the fact that "Zisumbo focused her job search on 'mostly part-time

---

[100] Dkt. 110 at 37.

[101] *See EEOC v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980).  *Sandia* is an Age Discrimination in Employment Act case, but the parties agree the concepts concerning mitigation discussed in *Sandia* also apply here.  In the absence of obvious authority to the contrary, the court follows the parties' lead and applies authority from analogous contexts here.

[102] *Brooks v. Via Christi Reg'l Med. Ctr., Inc.*, No. 08–1376–JTM, 2010 WL 446523, at *13 (D. Kan. 2010).

[103] *Sandia Corp.*, 639 F.2d at 627.

[104] *See Justice v. Crown Cork & Seal Co.*, No. 06–CV–66–J, 2009 WL 10701444, at *4 (D. Wyo. 2009) (collecting cases).

[105] Dkt. 110 at 35.

work.'"[106]  Zisumbo responds that she was not obligated to seek full-time employment because she was a part-time employee at the time of her termination.[107]  Zisumbo further responds that her efforts to obtain part-time employment were reasonable.[108]

Zisumbo does not dispute Convergys's assertion that suitable job openings existed.  Thus, the court finds Convergys has satisfied its burden under the first factor.  But the court further concludes that a genuine dispute of material fact exists as to the second factor.  Namely, whether Zisumbo's efforts to obtain suitable employment were reasonable.

The court agrees with Zisumbo that she was not necessarily required to seek out full-time positions.  At the time of her termination, Zisumbo was a part-time employee.  Thus, the requirement that Zisumbo make reasonable efforts to find "comparable" employment would encompass part-time positions.[109]  Whether Zisumbo's efforts were reasonable is a question best left for a jury.  As Convergys points out, Zisumbo's period of unemployment spans nearly ten times the average duration for a 20- to 24-year-old woman.[110]  But Zisumbo has also provided evidence that she applied to more than 50 jobs between October 2013 and January 2014.[111]  Faced with these facts, a reasonable juror could conclude that Zisumbo's efforts to obtain comparable employment were reasonable.  As a result, Convergys is not entitled to summary judgment on this issue.

---

[106] Dkt. 110 at 35.

[107] Dkt. 124 at 28.

[108] Dkt. 124 at 28.

[109] *Brooks*, 2010 446523, at *13.  The Second Amended Complaint's allegation that Zisumbo intended to resume full-time work at Convergys as of June 24, 2013, does not affect this conclusion.  Dkt. 91, ¶ 17.  While Zisumbo may well have *intended* to switch back to full-time work, she had not done so at the time of her termination.

[110] Dkt. 132 at 27.

[111] Dkt. 124 at 28.

### b. Record Keeping

Convergys also argues it is entitled to summary judgment because Zisumbo did not keep records of any income earned after her termination.[112]  Convergys argues this failure to keep records should bar Zisumbo from recovering lost-wage damages.[113]  The court disagrees.

First, Convergys fails to point to any authority conclusively establishing that any interim earnings must be deducted from an award of lost-wage damages in an FMLA action.[114]  But even assuming that were the case, Convergys fails to identify any authority suggesting that a failure to keep records of interim earnings precludes a court from awarding lost-wage damages in the first instance.  Indeed, Convergys does not explain why the parties could not put on evidence of damages at trial, including any alleged interim earnings.  Therefore, the court will not grant Convergys summary judgment on this issue.

### iv. Individual Liability Under the FMLA

Finally, Convergys argues summary judgment should be granted on Zisumbo's FMLA claim in favor of Mitchell and Woldberg because they are not "employers" under the FMLA.[115]  The court agrees.

---

[112] Dkt. 110 at 37.

[113] Dkt. 110 at 38.

[114] Convergys cites to Title VII cases for the proposition that interim earnings must be deducted from awards of back pay.  *See* dkt. 110 at 38 n.17.  But that requirement is born out of Title VII's statutory text.  Title VII provides in relevant part, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."  42 U.S.C. § 2000e-5.  Convergys provides no argument suggesting the court should apply Title VII's statutory requirements in the FMLA context.

[115] Dkt. 110 at 38.  Convergys also argues that, even if they are employers, Mitchell and Woldberg did not violate the FMLA.  But because the court concludes Mitchell and Woldberg are not employers under the FMLA, the court does not address this argument.

A plaintiff claiming FMLA interference must prove that the defendant is her employer.[116] The FMLA defines "employer" to include "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."[117]  The FMLA's implementing regulations provide some clarification of this definition, noting that "individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA."[118]

As an initial matter, the Tenth Circuit has not decided whether individuals may be held liable under the FMLA.  But the plain language of the statute and the implementing regulations suggest as much.  Further, district courts in this circuit have widely concluded that individuals may be held liable as "employers" under the FMLA.[119]  Thus, the court concludes individuals may be held liable under the FMLA.

While there seems to be widespread agreement among district courts concerning whether individuals can be "employers" under the FMLA, there is less agreement concerning how to determine whether an individual is an "employer."  Some courts apply the "economic reality test" to determine whether an individual is an employer under the FMLA.[120]  The economic reality test requires the court to consider four nonexclusive factors in making its determination: "(i) whether the alleged employer has the power to hire and fire employees; (ii) whether the alleged employer supervises and controls employee work schedules or conditions of

---

[116] *See* 29 U.S.C. § 2615(a)(1), (2); *see also Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 ("To prevail on an [interference] claim, an employee must prove that . . . the defendant was an employer as defined under the FMLA."); *Miles v. Unified School Dist. No. 500, Kan. City, Kan.*, 347 F. Supp. 3d 626 (D. Kan. 2018) ("When a plaintiff brings an FMLA retaliation or discrimination claim, plaintiff must establish that the defendant is her employer.").

[117] 29 U.S.C. § 2611(4)(A)(ii)(I).

[118] 29 C.F.R. § 825.104(d).

[119] *See, e.g., Rowley v. Brigham Young Univ.*, 372 F. Supp. 3d 1322, 1331 (D. Utah 2019).

[120] *See, e.g., Saavedra v. Lowe's Home Ctrs., Inc.*, 748 F. Supp. 2d 1273, 1292 (D.N.M. 2010).

employment; (iii) whether the alleged employer determines the rate and method of payment; and (iv) whether the alleged employer maintains employment records."[121]  Other courts apply a "control" test, asking "whether the [individual] defendant had the ability to control, in whole or in part, whether the plaintiff could take a leave of absence and return to the position."[122]  And finally, a number of courts have held that "[i]ndividuals who have no corporate role beyond a managerial position are not employers under the FMLA."[123]

Convergys urges the court to follow the last approach, arguing only corporate officers are employers under the FMLA.[124]  Zisumbo does not explicitly advocate for one approach to the exclusion of others but argues the court should construe the term expansively.[125]

The Tenth Circuit has not weighed in on which test, if any, courts should apply to determine who is an employer under the FMLA.  The Tenth Circuit does, however, apply the economic reality test to determine who is an employer under the Fair Labor Standards Act (FLSA).[126]  This is relevant for at least two reasons.  First, the FLSA defines "employer" to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee."[127]  This is the same language Congress used to define "employer" in the FMLA.  And second, the Tenth Circuit has looked to existing FLSA caselaw to interpret analogous FMLA provisions in the past.[128]  Thus, the court concludes the economic reality test—as used to

---

[121] *Id.*

[122] *Pedersen v. W. Petroleum, Inc.*, No. 2:07–CV–997 TS, 2008 WL 977370, at *3 (D. Utah Apr. 9, 2008).

[123] *See, e.g.*, *Branham v. Delta Airlines*, 184 F. Supp. 3d 1299, 1314 (D. Utah 2016); *Stuart v. Regis Corp.*, No. 1:05-cv-16 DAK, 2006 WL 1889970, at *6 (D. Utah July 10, 2006).

[124] Dkt. 110 at 39.

[125] Dkt. 124 at 31.

[126] *See, e.g.*, *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998).

[127] 29 U.S.C. § 203(d).

[128] *See, e.g.*, *Bass v. Potter*, 522 F.3d 1098, 1103–04 (10th Cir. 2008).

determine who is an employer under the FLSA—is the proper test for evaluating whether an individual is an employer under the FMLA.

As explained above, the economic reality test requires the court to consider four nonexclusive factors: (1) whether the alleged employer has the power to hire and fire employees, (2) whether the alleged employer supervises and controls employee work schedules or conditions of employment, (3) whether the alleged employer determines the rate and method of payment, and (4) whether the alleged employer maintains employment records.  "This test is based upon the totality of the circumstances, and no one factor in isolation is dispositive."[129]  Having considered the four factors and the totality of the circumstances, the court concludes neither Mitchell nor Woldberg are employers under the FMLA.

As to the first factor, it seems that both Mitchell and Woldberg possessed the power to hire and fire employees, at least in part.  Mitchell's signature appears on Zisumbo's termination record on the line labeled "Manager Review/Signature," indicating Mitchell likely had authority to fire employees.[130]  And according to her deposition testimony, Woldberg had reinstated employees in the past after they had been terminated, suggesting she had at least some variation of hiring authority.[131]  As to the second and third factors, Zisumbo has not presented evidence suggesting that Mitchell or Woldberg supervised or controlled employee work schedules and conditions of employment.  Nor has Zisumbo presented evidence suggesting that Mitchell or Woldberg determined rates and methods of payment for employees.  As to the fourth factor, it is clear that Convergys maintained Zisumbo's employment records.  But it does not appear that

---

[129] *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 570 (10th Cir. 1994).

[130] Dkt. 110-3, Ex. Y.  Or at the very least, Mitchell had authority to review and approve terminations effected by supervisors.

[131] Dkt. 124-6, Ex. 6.

Mitchell or Woldberg maintained employment records on their own accord.  That is, any employment records maintained here by Mitchell and Woldberg were maintained on behalf of Convergys.

Considering the totality of the circumstances, the court concludes Mitchell and Woldberg were not employers under the FMLA.  While Mitchell and Woldberg appear to have possessed at least some hiring and firing authority, they do not satisfy any of the other economic-reality factors.  Further, Mitchell and Woldberg are not corporate officers of Convergys.  Nor has Zisumbo identified evidence suggesting that Mitchell and Woldberg controlled her ability to take FMLA leave.  Without more, the court will not consider Mitchell and Woldberg to be employers under the FMLA.  Thus, the court grants summary judgment on this issue in favor of Mitchell and Woldberg.

## II. ZISUMBO'S ERISA CLAIM

Both parties move for summary judgment on Zisumbo's ERISA claim in its entirety.  In her Motion, Zisumbo argues Convergys violated ERISA and therefore she is entitled to damages and certain statutory penalties.  In its Motion, Convergys argues—among other things—that Zisumbo's ERISA claim fails because it is time-barred.  The court concludes Zisumbo's ERISA claim is time-barred and therefore GRANTS summary judgment in Convergys's favor on this claim.  Because the time bar disposes of Zisumbo's ERISA claim in its entirety, the court need not address the other arguments raised in the parties' papers.

"Statutes of limitations establish the period of time within which a claimant must bring an action."[132]  Generally, a statute of limitations begins to run when a claim "accrues."[133]  As the

---

[132] *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 105 (2013).

[133] *Id.*

Tenth Circuit has explained, "federal law controls issues related to when federal causes of action accrue."[134]  To that end, a claim generally accrues under the "federal discovery rule"—and the statute of limitations begins to run—when "the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action."[135]

Parties are permitted, however, to contract around these general rules.  As the Supreme Court has explained, in the absence of a controlling statute to the contrary, parties may agree to alter both the length of a limitations period and the date of its commencement.[136]  This is true even where the parties "agree by contract to a particular limitations period . . . that starts to run *before the cause of action accrues*, as long as the period is reasonable."[137]

Here, Convergys argues Zisumbo's ERISA claim is time-barred by virtue of a provision in the job application Zisumbo filled out when applying to work at Convergys.[138]  The online job application Zisumbo completed in 2012 provides in relevant part, "any claim or lawsuit relating to my employment with Convergys . . . must be filed no more than six (6) months after the date of the employment action that is the subject of the claim or lawsuit."[139]  The effect of this provision is twofold.  First, it imposes a six-month limitation period on any claim or lawsuit relating to Zisumbo's employment with Convergys.  And second, it fixes the date at which that limitations period begins to run as "the date of the employment action that is the subject of the claim or lawsuit."  Convergys argues Zisumbo's ERISA claim is time-barred because it was not brought within six months of Convergys's alleged failure to notify Zisumbo of her enrollment in

---

[134] *Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004).

[135] *Id.* (citation omitted).

[136] *Heimeshoff*, 571 U.S. at 107.

[137] *Id.* at 106 (emphasis added).

[138] Dkt. 110 at 45.

[139] Dkt. 31-2 at 5.

the Aetna Plan—which occurred in 2013.[140]  Convergys also argues, in the alternative, that

Zisumbo's claim accrued in 2013 under the federal discovery rule.[141]

      In response, however, Zisumbo does not meaningfully address Convergys's argument

that the provision in the job application acts as a time bar to her ERISA claim.  Instead, she

dedicates the majority of her briefing to arguing that, under the federal discovery rule, her

ERISA claim did not accrue until 2018.[142]  At most, Zisumbo addresses Convergys's contractual

argument in passing, stating "Defendants' suggestion that [Zisumbo] was required to bring her

ERISA claim within six months of Convergys's violation even though she was unaware of the

violation has no support."[143]

      But Convergys does provide support for its contractual argument, citing to and explaining

the applicability here of *Heimeshoff*, which held that parties can contractually agree to both the

limitations period and the commencement of that period—even if the limitations period begins to

run before the claim accrues.[144]  Zisumbo does not respond to Convergys's citation to this

binding authority.  Zisumbo does not argue, for example, that *Heimeshoff* is inapplicable here or

that the contractual provision at issue is unreasonable—and therefore unenforceable—under

---

[140] Dkt. 110 at 45.  Convergys's alleged failure to provide Zisumbo with notice that she was enrolled in the Aetna Plan is the earliest employment action that forms the basis for Zisumbo's ERISA claim.  Zisumbo's other bases for damages under ERISA, however, are also predicated on employment actions that took place more than six months before Zisumbo filed her Second Amended Complaint.  Convergys's failure to provide Zisumbo with a COBRA notice stating her coverage under the Aetna Plan had been terminated likewise occurred in 2013.  And, under Zisumbo's theory of the case, Convergys's alleged failure to produce documents related to the Aetna Plan in response to discovery requests occurred in 2015.

[141] Dkt. 110 at 49–50.

[142] *See* dkt. 124 at 33.  Zisumbo also notes that the court, in its prior order granting Zisumbo leave to amend her complaint, stated that Zisumbo's ERISA claim "appears timely."  Dkt. 90 at 12.  But the court's order granting leave to amend was not a final adjudication of the timeliness of Zisumbo's ERISA claim.  Instead, the discussion of timeliness was raised in the context of whether a proposed amendment was futile under Rule 15(a).  To that end, the court concluded, "Zisumbo has raised a colorable claim her ERISA claim is not time barred."  Dkt. 90 at 13.

[143] Dkt. 124 at 36.

[144] *See* dkt. 110 at 37–38.

*Heimeshoff*.  And this court abstains from making arguments for parties that the parties have not made themselves.

As a result, the court must credit Convergys's argument that Zisumbo's ERISA claim is time-barred.[145]  The parties agreed to a six-month limitations period that began to run at the date of the employment action at issue, regardless of when the claim accrues.  And Zisumbo's ERISA claim, brought in 2018, is based on employment actions that all took place more than six months before she filed her ERISA claim.[146]  Therefore, the court GRANTS summary judgment in Convergys's favor on Zisumbo's ERISA claim.

### III. ZISUMBO'S NEGLIGENCE CLAIM

Finally, Convergys moves for summary judgment on Zisumbo's negligence claim, arguing it is preempted by ERISA.[147]  In her Opposition, Zisumbo acknowledges that her negligence claim is preempted by ERISA.[148]  Thus, the court GRANTS summary judgment in Convergys's favor on Zisumbo's negligence claim.

---

[145] This is not to say the court must always credit unopposed arguments.  For example, if an unopposed argument is contrary to binding precedent, then the court clearly must reject that argument.  But where, as here, an argument is supported by binding precedent and goes unopposed, the court will credit the argument.

[146] *See supra* note 140.

[147] Dkt. 110 at 52–53.

[148] Dkt. 124 at 39.

## CONCLUSION

For the reasons explained above:

1. Zisumbo's Motion for Summary Judgment[149] is DENIED

2. Zisumbo's Motion for Spoliation Sanctions[150] is DENIED.

3. Convergys's Motion for Summary Judgment[151] is GRANTED IN PART and DENIED IN PART as follows:

> a. The court GRANTS summary judgment in Defendants Mitchell and Woldberg's favor on Zisumbo's FMLA claim;
>
> b. The court GRANTS summary judgment in Convergys's favor on Zisumbo's ERISA claim;
>
> c. The court GRANTS summary judgment in Convergys's favor on Zisumbo's negligence claim; and
>
> d. The court DENIES Convergys's Motion in all other respects.

**SO ORDERED** this 29th day of June 2020.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[149] Dkt. 112.

[150] Dkt. 122.

[151] Dkt. 110.